United States District Court
Southern District of Ohio
Western Division

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>  v.<br><br>Darias Jackson,<br><br>        Defendant. | Case No. 1:20-cr-074<br><br>District Judge Michael R. Barrett |

Sentencing Memorandum of Defendant Darias Jackson

Defendant Darias Jackson ("Mr. Jackson") has entered a guilty plea pursuant to Criminal Rule 11(c)(1)(C) to Counts Two, Three, and Six of the Superseding Indictment in this case: Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371; Witness Tampering, in violation of 18 U.S.C. §§ 1512(b)(2)(A) and 2; and Conspiracy to Tamper with a Witness in violation of 18 U.S.C. §§ 1512(b)(2)(A) and 1512(k)  This matter is scheduled for sentencing on the afternoon of October 6, 2025. Mr. Jackson submits the following memorandum for the Court's consideration in determining his sentence. For all the reasons set forth below, Mr. Jackson asks the Court to impose a sentence of time served, the approximate equivalent of a 7-year sentence in the Bureau of Prisons.

<u>Sentencing Memorandum</u>

a.    Introduction

This case has had a long and somewhat tortured history that began in 2019 when someone shot A.W. As discussed in greater detail below, A.W. originally identified Mr. Jackson as the person who shot him and Mr. Jackson was charged in state court with the offense of felonious

assault. Mr. Jackson was quickly advised by friends and family that A.W. had openly acknowledged to many in the community that Mr. Jackson was not the individual who shot him and that he wished to recant his identification of him. Had Mr. Jackson simply allowed the judicial process to play out in state court, he almost certainly would have been acquitted, and this federal matter would never have occurred. Unfortunately, Mr. Jackson became impatient and frustrated with the state proceedings and, in his frustration, sought to shortcut the judicial system to accelerate his exoneration. In doing so, he managed to violate the federal laws related to the fair and just administration of justice for which he now appears before the court for sentencing. The Court should now sentence Mr. Jackson fairly for his ill-advised efforts to game the system, not for conduct which has never been proven and likely never occurred.

b. *Factual and procedural history*

On September 19, 2019, A.W., a longtime friend of Mr. Jackson, was shot in a parking lot shortly after having been seen arguing with Mr. Jackson. On October 2, 2019, A.W. identified Mr. Jackson as the shooter while A.W. was heavily drugged and shortly after having been awoken from a medically induced coma. Upon information and belief, this highly suspect identification was the one and only time A.W. identified Mr. Jackson as his shooter – an identification he has sought to recant over the last six years, including during the PSR process in this case. The defense intends to call A.W. as a witness during the sentencing hearing and allow him to finally give sworn testimony regarding what occurred that night in the parking lot.

Mr. Jackson was arrested by state authorities on October 4, 2019 and remained in custody while he defended his state charges. Unfortunately, rather than simply allowing the fair administration of justice to play out, Mr. Jackson decided to take illicit steps to seek to influence the prosecution against him. Specifically, he conspired with his brother and girlfriend to pay A.W.

2

in an effort to influence the due administration of justice.  The state charges against Mr. Jackson were subsequently dismissed on January 9, 2020 and he was promptly taken into federal custody on a supervised release violation filed in regard to case 1:12-cr-095 for which he was still under supervision at the time. The violation of his supervised release was similarly based upon his alleged shooting of A.W.  The government continued its investigation into Mr. Jackson's role into the shooting of A.W. while he remained in custody on the supervised release violation.  Again, Mr. Jackson regrettably chose to attempt to influence the due administration of justice by conspiring with his girlfriend to not cooperate with the grand jury process.  That same grand jury ultimately indicted Mr. Jackson, his brother, and his girlfriend for their respective roles in the efforts to tamper with and influence the due administration of justice.

      Mr. Jackson entered into a plea agreement to take responsibility for his efforts to influence the due administration of justice.  Mr. Jackson respectfully asks the Court to consider the tumultuous nature of his past and the inherently non-violent nature of his admitted offenses when fashioning a sentence which is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Specifically, Mr. Jackson respectfully asks the Court to sentence Mr. Jackson to time served, the functional equivalent of a 7-year sentence.

c.     *The guiding principles of 28 U.S.C § 3553(a)*

      The Sentencing Reform Act ("the Act"), 18 U.S.C. § 3551 et. seq., imposes "overarching instructions that district courts must select a sentence which is sufficient but not greater than necessary" to achieve the sentencing goals outlined in § 3553(a)(2). *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007). Those goals include the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, (C) protect the public from future crimes of the defendant,

3

and (D) provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Gall v. United States*, 128 S. Ct. 586,596 at n.6 (2007).

To arrive at a sentence that serves these goals without being greater than necessary, the Act directs district courts to consider the many factors listed in § 3553(a)(1)-(7). Section 3553(a)(1) begins with the 'broad command' to consider the nature and circumstances of the offense and the history and characteristics of the defendant. Section 3553(a)(2) commands the Court to consider "the need for the sentence imposed." Sections §§ 3553(a)(4) and (5) require the district court to consider the advisory Sentencing Guidelines range and relevant policy statements issued by the Sentencing Commission. These Guidelines can, however, provide only a "rough approximation" of what might be an appropriate sentence. *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007). Section 3553(a)(6) requires the district court to consider the need to avoid unwarranted disparities in choosing a sentence. This necessarily encompasses a corresponding duty to embrace "warranted" disparities amongst defendants who are not similarly situated. *See Gall*, at 600. Finally, § 3553(a)(7) requires the court to consider the need for restitution, if applicable.

Taken together, these considerations, often referred to as "the 3553 factors," are more than a laundry list of discrete sentencing factors. Rather, they comprise "a tapestry of factors, through which runs an overarching principle" - the court's duty to "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriquez*, 527 F.3d 221, 228 (1st Cir. 2008). These factors will be discussed below where relevant to these circumstances.

4

    d.    *Relevant factors for consideration in passing sentence*

        (1)    <u>The Advisory Sentencing Guidelines</u>

            (A)    Mr. Jackson Objects to the Determination that he has not accepted responsibility

In his objections to the amended initial PSR, Mr. Jackson objected to the determination that he has not accepted responsibility for his crime and restates those arguments herein. Mr. Jackson plead guilty and admitted his role in the efforts to influence both the state prosecution and the federal investigation into his conduct. He signed a 3-page statement of facts drafted by the government which outlined in detail his specific role in the obstruction of justice and witness tampering at the center of this case. It strains logic to argue that his denial of a crime for which he is not charged is relevant to that analysis. The shooting of A.W. ought not be considered as "relevant conduct for which he is accountable under U.S.S.G. § 1B1.3" in this case. The PSR in this matter calculates Mr. Jackson's sentencing range to be 135 to 168 months based upon an offense level of 30 and a criminal history category of IV. Assuming that the Court acknowledges the departure to Criminal History Category III warranted by Mr. Jackson's minor misdemeanor the marijuana convictions, the correct range ought to be 87 to 108 months based upon an offense level of 27 and a criminal history category of III.

Even assuming *arguendo* that the shooting is technically relevant conduct which the guidelines allow to be considered, Mr. Jackson respectfully asks this Court to focus on the criminal conduct that Mr. Jackson readily admits to when crafting a sentence pursuant to the § 3553 factors which is tailored to the specific demands of this case.

  (B)  Mr. Jackson Objects to the PSR's Cross Reference to First Degree Murder

In his objections to the amended initial PSR, Mr. Jackson objected to the determination that the appropriate cross reference in this matter is to first degree murder and restates those arguments herein. Mr. Jackson agrees that the guideline applicable to Group 1 in regard to Counts 2 and 3 is U.S.S.G. § 2J1.2. As such, the offense level is 14 pursuant to U.S.S.G. § 2J1.2(a). Further, no substantial interference with the administration of justice occurred as Ms. Brown's perjury before the grand jury did not result in any of the required events outlined in Application Note 1 as necessary to trigger the enhancement outlined in U.S.S.G. § 2J1.2(b)(2). Mr. Jackson objects to any cross reference beyond this point. However, as argued below, if the Court deems a cross reference to be warranted the appropriate cross reference is to Aggravated Assault pursuant to U.S.S.G. § 2A2.2.

The PSR moves beyond the base offense level by following U.S.S.G. § 2J1.2(c)(1) to apply U.S.S.G. § 2X3.1 (Accessory after the Fact) on the argument that Mr. Jackson obstructed a criminal investigation. (PSR at ¶¶ 70-71). The proper process under U.S.S.G. § 2X3.1 is to determine what "underlying offense" was being obstructed and apply the corresponding guidance. *See United States v. Pennington*, 78 F.4th 955 (6th Cir. 2023). In *Pennington*, the Sixth Circuit dealt with similar circumstances of witness tampering to the present matter. The 6th Circuit found that the proper method to apply U.S.S.G. § 2X3.1 was to "determine which offense Pennington obstructed, use that guideline's base offense level, and then subtract six." *Id.* at 964. Here when Mr. Jackson obstructed the investigation by witness tampering, all he knew was that he had been indicted in state court for felonious assault. In fact, the PSR properly states that, "While [the supervised release violation was] pending, the Government *continued to investigate Darias Jackson's role in the shooting*." (PSR at ¶ 44) Despite this fact, the PSR somehow imbues Mr. Jackson with the

6

understanding that a secret grand jury was specifically investigating him for a violation of 18 U.S.C. § 922(g) and then uses that leap of logic to bootstrap a cross reference to first degree murder. At their core, the sentencing guidelines are (presumably) intended to assist the court in assessing the markedly different sentences warranted by markedly different conduct.  Someone who knows they are seeking to obstruct a first-degree murder investigation perhaps deserves the guideline range calculated by the PSR.  On the other hand, someone such as Mr. Jackson who, at worst, understood only they were obstructing a felonious/aggravated assault case, properly deserves the guideline for that significantly, and understandably, less severe conduct.

Following, the proper application of U.S.S.G. § 2X3.1 in this matter would be to cross-reference to U.S.S.G. § 2A2.2 which supplies a base offense of level of 14. That base offense level is then increased as the specific characteristics of the assault allow for a +5 enhancement for discharge of a firearm (U.S.S.G. § 2A2.2(b)(2)) and a +7 enhancement for permanent bodily injury (U.S.S.G. § 2A2.2(b)(3)(C)). However, the cumulative total of these enhancements cannot exceed 10 levels pursuant to U.S.S.G. § 2A2.2(b)(3).  Therefore, the adjusted base offense level would be 24.  That level is then subject to the 6-point reduction mandated by U.S.S.G. 2X3.1(a)(1) for accessory after the fact resulting in a final offense level of 18.  At a criminal history category of III, the resulting guideline range is 33-41 months, even before addressing Mr. Jackson's acceptance of responsibility.

In the event the determination is made that the investigation being obstructed at that time was the pending indictment for his alleged possession of ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(1), as the government contends, Mr. Jackson agrees that the base offense level set forth in U.S.S.G. § 2K2.1 should apply subject the 6-point reduction mandated by U.S.S.G. 2X3.1(a)(1). Mr. Jackson does object, however, to the application to the cross

reference triggered by U.S.S.G. § 2K2.1(c)(1) based upon the finding that he "… used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense …" (PSR at ¶ 72). As stated above, Mr. Jackson denies that he shot A.W. and, as such, no cross-reference ought to apply.

Finally, assuming *arguendo* that the shooting of A.W. is the appropriate cross-reference, Mr. Jackson argues against the determination that the shooting constitutes Attempted Murder. Mr. Jackson further and more specifically objects to the determination that the object of the offense would have constituted first degree murder pursuant to U.S.S.G. § 2A2.1(a)(1). Application Note 1 to that section defines "first degree murder" as conduct which would constitute first degree murder under 18 U.S.C. § 1111. That statute defines first degree murder to include, in relevant, part the killing of a human being "with malice aforethought." The statute goes on to define a series of typical examples (poison, lying in wait, in the perpetration of another felony, etc.), none of which resemble the facts of this case.

The prosecution has pointed to ample Sixth Circuit case law that permits a determination of Attempted First Degree Murder in cases which bear some resemblance to this case. The prosecution is correct that the Sixth Circuit has determined that the requisite killing intent may be formed in mere moments and that a killing may be premeditated so long as the killer is "fully consciously aware of that intent." See *United States v. Howell,* 17 F.4th 673 (6th Cir. 2021); *United States v. Ely*, 50 F. App'x 411, 414 (6th Cir. 2018). However, Mr. Jackson emphasizes that the requisite intent and premeditation required for the first degree murder cross-reference are not supported by the facts of this case.

For example, the prosecution correctly cites *United States v. Howell*, 17 F.4th 673, to support the proposition that simply firing a gun at someone is sufficient to evidence intent to kill.

8

In *Howell*, the defendant shot his gun at a bank teller behind bulletproof glass to try and get her to open a door. *Howell*, 17 F.4th 673, 678-79. The court determined that firing a gun at a person is sufficient to infer an intent to kill. *Id.* at 690. Using a gun to commit a robbery is much different than shooting at someone in a rage during an argument. Both are condemnable actions but one, the robbery, is much more characteristic of the calculated intent to use a weapon to kill or harm. Even assuming Mr. Jackson was the shooter, the facts and video support a situation where impulse overtook discipline and tragedy ensued.

The prosecution also points to *United States v. Ely*, 50 F. App'x 411, to support the proposition that one only needs to be fully aware of their killing intent for a killing or attempted killing to be premeditated. In *Ely*, the defendant took his victim out into the woods on the pretense of testing out a gun. *Ely*, 50 F.App'x 411 at 412. After firing the gun in the air several times, he shot at her, hitting her in the head, face, and neck. *Id.* at 412. Fortunately, she survived. *Id.* at 412. These circumstances bear no resemblance to those of the shooting of A.W. An argument between friends allegedly devolving into a shooting does not provide the necessary time for someone to become aware of their killing intent. This is especially apparent when compared to a case where a woman was taken out into the woods by an armed man and shot.

While the cases cited by prosecution do stand for the principal that the killing intent and premeditation necessary for first degree murder may be formed in a short period of time, these cases can be factually distinguished from the shooting of A.W as it is not apparent that the shooter possessed premeditated intent to kill. Even if Mr. Jackson was A.W.'s shooter, which he denies, the PSR states that the two men were arguing shortly before A.W. was shot. (PSR at ¶¶ 38-39). If that is the case, the shooter may have shot A.W. in anger without thinking and, following, would have lacked the necessary killing intent to have bene "fully consciously aware of that intent."

9

Absent the premeditation required for First Degree Murder, the appropriate cross reference would be that of attempted murder pursuant to U.S.S.G. § 2A2.1(a)(2) with a base offense level of 27. That base level would be subject to a +4 level enhancement for permanent bodily injury pursuant to U.S.S.G. § 2A2.1(b) for a final adjusted offense level of 31. That resulting level 31 offense would then be reduced by 6 levels pursuant to U.S.S.G. 2X3.1(a)(1) for a final offense level of 25. At a criminal history category III, the resulting guideline range would be 70 to 87 months, again before considering Mr. Jackson's acceptance of responsibility.

Finally, and regardless of the foregoing, Mr. Jackson maintains that he did not shoot A.W. and believes crafting a sentence based exclusively upon the notion that he did is inappropriate.

(2) The History and Characteristics of Mr. Jackson

Mr. Jackson was born on November 7, 1989, and has lived in Cincinnati his entire life. (PSR at ¶ 123). Mr. Jackson was raised by his mother, a television engineer, and his two older brothers. (PSR at ¶¶ 123-125). Mr. Jackson's father is a musician who lived and Dayton and only visited during the holidays. (PSR at ¶¶ 123, 125). His Mother's busy schedule meant that his brothers and other family members frequently had to care for Mr. Jackson. (PSR at ¶ 125). Mr. Jackson graduated high school in 2005. (PSR at ¶ 126). His senior year of high school, Mr. Jackson met Jessica Brown the love of his life. (PSR at ¶ 127). Together they have three children. (PSR at ¶ 127).

Mr. Jackson grew up in a violent and dangerous neighborhood. (PSR at ¶¶ 125, 128). He remembers first becoming aware of drug trafficking in his neighborhood when he was only 12 or 13 years old. (PSR at ¶ 125). He also witnessed a double homicide. Later when he was only fifteen years old, Mr. Jackson lost his close friend Lorenzo Hairston when Lorenso was gunned down less than day after they had last seen each other. Mr. Jackson has a tattoo that memorializes Lorenzo.

These traumas deeply affect Mr. Jackson to this day and in his youth drove him towards substance abuse. He started drinking and using marijuana as a young teen to cope and his struggles resulted in several minor juvenile convictions. (PSR at ¶¶ 98-100).

Unfortunately, these problems only grew as Mr. Jackson entered adulthood. (PSR at ¶¶ 101-122). He picked up a host of misdemeanor and low-level felony charges and convictions as he let mistake after mistake trip him up. (PSR at ¶¶ 101-122). Many of these crimes were drug offenses. (PSR at ¶¶ 100, 102-104, 106). Mr. Jackson's run ins with the law and history of substance abuse have made it difficult for him to build a stable drug and crime-free life. His battle with addiction took years as he bounced in and out of treatment. (PSR at ¶¶ 140-145). However, shortly before his incarceration in the current matter, Mr. Jackon successfully completed substance abuse programming with IKRON. (PSR at ¶ 145)

Since he was incarcerated in autumn 2019, Mr. Jackson has missed much of his children's and family's lives, including the murder and funeral of his older brother Jearid and his other brother Gregory's illness. (PSR at ¶ 128). Missing out on years of children's lives and being unable to support his brother and mother after Jearid's murder affected Mr. Jackson deeply. (PSR at ¶ 131). He attends church regularly and has developed positive habits with goals in mind. (PSR at ¶ 131). At the end of his incarceration, Mr. Jackson wants to use his skills and past experience as a business owner to find gainful employment so he can marry Jessica and support their family. (PSR at ¶¶ 131, 151).

    (3)    <u>Nature and Circumstances of the Offense</u>

Mr. Jackson's offenses are witness tampering and conspiracy to obstruct justice. These are serious crimes which fundamentally undermine justice, but, in and of themselves, are not violent offenses. As discussed above, the Advisory Sentencing Guidelines calculated in the PSR cross-

11

reference to attempted murder on the theory that is relevant conduct. As discussed above, Mr. Jackson maintains that he did not shoot his friend and that as such this cross reference is inappropriate for crafting a proper sentence in this case. Mr. Jackson's behavior was dishonest and obstructionist, not violent. It does not make him an attempted murderer. Mr. Jackson maintains that he did not shoot A.W. and refuses to implicate himself for something that he did not do. He readily accepts responsibility for the offenses committed and respectfully asks that this Court consider the vast chasm between witness tampering and attempted murder when considering the severity of his crime.

    (4)    <u>Need for the sentence imposed</u>

Mr. Jackson accepts responsibility for his actions and has willingly entered into a plea agreement with the Government. A sentence of time served or at low end of the plea deal range is sufficient to address the purpose of sentencing lain out in *Gall*.

Since his arrest on October 4, 2019, Mr. Jackson has spent just over 6 years in custody. This is a substantial amount of time and reflects the severity of Mr. Jackson's crimes. It adequately punishes him for undermining the pursuit of justice. Furthermore, it is also an effective deterrent. As discussed above, Mr. Jackson has missed years of his children's lives, the death of his beloved elder brother Jearid, and was unable to present for his brother Gregory and his mother in a time where they have greatly needed him. The previous are all the direct result of Mr. Jackson's conduct and resulting incarceration. These consequences have made a lasting impact on Mr. Jackson and will deter him from any future crime.

Furthermore, Mr. Jackson has used his time behind bars to improve himself and develop better habits. These habits will help him find honest work in the trades or in a business that will allow him to support his family. His support network will help keep him clean and away from the

situations that led to his past criminal behavior. Thus, community will be sufficiently protected from any future threat that he presents. His life skills and support network will allow him to continue rehabilitating outside of the carceral system. Following keeping Mr. Jackson incarcerated any longer serves no purpose in protecting the community or advancing his continuing rehabilitation.

      (5)    <u>The kinds of sentences available</u>

The Court is asked to consider the conditions of Mr. Jackson's confinement as it determines a just sentence. Said another way, a sentencing court ought to consider the impact of a particular sentence upon a defendant as it determines a sentence because different sentences impact defendants differently. These differences are based upon the circumstances surrounding each sentence and each defendant. Consider two hypothetical defendants: Defendant #1 is sentenced to 5 years in the BOP but is allowed to self-surrender to the institution. Defendant #1 will spend their entire sentence in the far more beneficial environment of the BOP which includes classes and programming, library access, educational and vocational opportunities, better food and medical care, and the ability to exercise and maintain personal and spiritual heath. All of this is provided in a more campus-like environment where an inmate can actually move around and feel the sun upon their face.

Compare the above to Defendant #2 who, like Mr. Jackson is detained in the Butler County Jail while their case is resolved. That defendant is locked down for 20 hours of every day in a small room with 15 other inmates. There is no programming, no education, *extremely* limited access to medical care, little to no access to exercise, and *zero* access to fresh air or sunshine. Local jails such as Butler County are simply not designed to provide long-term housing in the same way a penitentiary is. While they presumably meet constitutional muster, the difference in

13

the quality of life provided is significant. While some corrective nature is part of any criminal sentence, we as a society are hopefully focused upon the rehabilitative aspect of any criminal sentence. If nothing else, a district court ought to consider the conditions of confinement given the sentence imposed.

Mr. Jackson has been detained in the Butler County Jail since his transfer to federal custody in January 2020. All told, Mr. Verlan will have been in custody for 6 years by the time he stands before the Court for sentencing, with the majority of that time being served in Butler County. That time is in no way equivalent to a similar period of custody in the BOP as contemplated by the blunt tool of the sentencing guidelines. The Court is asked to take this into consideration along with all the other sentencing factors when determining a final sentence.

e. Conclusion

Mr. Jackson deeply regrets his actions and takes full responsibility for interfering with the administration of justice. He is committed to returning to his family and living an honest law-abiding life. For all the reasons set forth above, a sentence of time served is sufficient to fulfill the principles and purpopses of sentencing.

Respectfully submitted,

_____
Paul M. Laufman (0066667)
Laufman Napolitano, LLC
4210 Hunt Road
Cincinnati, OH 45242
(513) 621-4556
(513) 621-5563 Fax
plaufman@LN-lawfirm.com
*Counsel for Defendant Darias Jackson*

Certificate of Service

    I hereby certify that a copy of the foregoing pleading was electronically filed on the 1st day of October 2025.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

                                                                                                                             _____
                                                                                                                            Paul M. Laufman